# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

MARY REELEY, TIMOTHY
REELEY, NOLAN REELEY, and
SUMMER REELEY,

    Plaintiffs,

v.

    Case No. 3:20-cv-1408-BJD-LLL

UNITED STATES OF
AMERICA,

    Defendant.
_____/

## **O R D E R**

**THIS CAUSE** is before the Court following a bench trial of this case. The Court considered those matters submitted and argued at trial as well as the parties' competing proposed findings of fact and conclusions of law (Docs. 71 and 72). The Court considered the pleadings, examined the evidence, observed those witnesses called at trial, and weighed the entirety of the record in entering its findings of facts and conclusions of law consistent with Federal Rule of Civil Procedure 52.

In its initial Order, the Court concluded Dr. Concepcion was negligent in his performance of a gastric sleeve surgery on Plaintiff.[1] The

---

[1] For all practical purposes, the Court treats the actions of Dr. Concepcion as controlling for both Dr. Concepcion and Dr. Dobbertien, as Dr. Concepcion was the lead

Court declined to resolve the issues of damages to allow the parties an opportunity to renew settlement discussion in light of its determination of liability.

Dr. Concepcion's use of a harmonic scalpel and perforation of the stomach with endo-scissors at the close of the procedure was a breach of the standard of care as was his failure to use a double line of staples. It resulted in Plaintiff suffering a gastric leak and a myriad of subsequent life-altering complications. Tr. 2:28; Tr. 7:72. Dr. Concepcion discharged Plaintiff from the hospital on August 15, 2018, after noting that Plaintiff showed no complications from surgery. (Doc. 59.1 at 327). At approximately 2:30 a.m. on August 16, 2018, Plaintiff returned to Naval Hospital Jacksonville ("NHJ") through the emergency room complaining of a "great deal" of stabbing and burning pain that was not relieved by medication. Id. at 393. Plaintiff's breathing was shallow and splintered owing to her discomfort. Id.

---

surgeon with ultimate say as to Plaintiff's treatment. Tr. 4:104. The parties agree the United States is the proper Defendant in this case as Dr. Concepcion was employed by the United States and working within the scope of his employment during the time of Plaintiff's alleged injury. (Doc. 32 at 29).

The Court refers to Mary Reeley as the primary Plaintiff throughout its Order, recognizing there are four Plaintiffs.

A CT scan revealed retained oral barium and a large air-filled pocket near the gastric pouch. (Doc. 59.1 at 438). The radiologist suspected a gastric leak. Id. at 439. Dr. Whiteman testified that inflammation "all over" Plaintiff's abdomen signaled at least a partially uncontained leak. Tr. 3:186. Similarly, Dr. Schroder testified that Plaintiff's leak was uncontained upon her discharge and it was not until days later the leak was contained. Tr 2:94-95. Dr. Schroder cited to Plaintiff's then existing reports of extreme pain, shallow breathing patterns, septic response, and inflammation. Id. at 94.

Doctor Mujtaba Butt is one of Plaintiff's treating physicians and an interventional gastroenterologist. Tr. 1:51. Dr. Butt began seeing Plaintiff in 2016 and paused seeing Plaintiff that same year until 2021. Tr. 1-55. When Dr. Butt saw Plaintiff in 2021 he reviewed her prior medical history, including her August 13, 2018 surgery at NHJ. He testified that Plaintiff experienced 5 remedial procedures, including clips, stents, and stitching to remediate her surgical complications. Tr. 1:76-77. He noted that Plaintiff's leak involved spillage of hydrochloric acid that causes a burning sensation and can harm organic tissue outside of the stomach. Id. at 69. Dr. Butt noted that Plaintiff still suffers from severe acid reflux that required referral to the Mayo Clinic. Id. at 88; (Doc. 58.30).

As a result of the complications following Plaintiff's gastric sleeve procedure, Plaintiff also became a patient of Dr. Shariq Latif for assistance with her post-operative pain starting in January 2019. Plaintiff has continued under his care through trial. Tr. 1:101; (Doc. 58.29 at 188). Dr. Latif is an anesthesiologist and pain management specialist. Id. at 95. Plaintiff reported sharp, burning, shooting, and throbbing pain that is not well controlled. (Doc. 58.29 at 1). It is particularly difficult at nighttime and complicates Plaintiff's ability to perform daily activities. Tr. 1:102. Dr. Latif noted that Plaintiff's pain ranged from 2 to 10 out of ten depending on whether she was medicated. Id. at 102 and 130; (Doc. 58.29 at 1). Dr. Latif attributed Plaintiff's chronic pain to her gastric sleeve surgery and the remedial surgeries that followed. Tr. 1:133. He testified that Plaintiff was not exaggerating her pain; would need monthly pain management visits for the "indefinite" future; and was not engaged in drug-seeking behavior. Id. at 134, 138 and 141.

Dr. Latif's findings were supported by observable physical manifestations such as an abdominal knot occurring near Plaintiff's surgical site that was painful to touch. Id. at 117. Plaintiff's pain also caused her mental distress and affected those around her, common occurrences among those suffering from chronic pain. Id. at 116.

Plaintiff, Mary Reeley has been married to Timothy Reeley for nearly 32 years. Tr. 1:167. They share two children: Nolan, age 25 and Summer, age 23. <u>Id.</u> at 168. Plaintiff had a longstanding history of diabetes and difficulty managing her weight. Tr: 4:110. Plaintiff's medical notes reported a body mass index between 45 and 49.9, headache, heartburn, irritable bowel, migraines, hypertension, back pain, and the frequent need to urinate. (Doc. 59.1 at 11). Plaintiff testified that her decision to undergo surgery was motivated by her desire to manage her diabetes. Tr. 2:185-86. She had reached the maximum dosage of metformin and was requiring increasing dosages of insulin to manage her blood sugar. <u>Id.</u>

Prior to her surgery, Plaintiff described herself as an active person. <u>Id.</u> at 187. Her typical day saw Plaintiff waking in the morning to pack lunches for her family and to go to work. <u>Id.</u> at 187-88. Plaintiff cooked dinner, completed chores, and cared for pets. <u>Id.</u> at 188-89. Plaintiff claimed to be free from chronic pain, mental health issues, and physical limitations. <u>Id.</u> at 193 and 198. A pre-surgery evaluation from psychologist Serena Bloomfield corroborates many of these claims. (Doc. 58.1 at 122-23).

Since having surgery Plaintiff has been unable to care for her family or home. <u>Id.</u> at 190. Plaintiff's mild Gastroesophageal reflux disease ("GERD") that was managed by Tums and Rolaids now requires the

maximum dosage of Protonix. Id. at 192. Plaintiff can no longer care for children or volunteer in the same capacity. Id. at 193. Other activities like bowling, driving, and spending time with her husband is limited by anxiety and pain. Id. at 195.

Immediately after regaining consciousness from the surgery, Plaintiff felt something was wrong. Id. at 201 and 202. Plaintiff felt like something was different as compared to prior surgeries and described an intense burning sensation that reached her entire abdomen accompanied by vomiting. Id. Once Plaintiff was discharged, she was unable to keep her medicine down. Id. at 203. Her pain intensified and eventually rendered Plaintiff immobile and crying in pain. Id. at 203-04. At trial, Plaintiff assigned her pain level a 10 out of 10.

When Plaintiff returned to the emergency room, she was administered morphine and the attending physician diagnosed Plaintiff with an abdominal abscess or leak. Id. at 206. Plaintiff required transfer to a different hospital for treatment, during which Plaintiff was terrified of dying. Id. at 207. Plaintiff's trauma was evident to the Court during her recollection of the events following her surgery.

Plaintiff went on to describe the efforts to drain the abscess, including the use of large percutaneous drains as "torture." Id. at 212. One

medical provider described Plaintiff's ordeal as "a never ending nightmare." (Doc. 58.30 at 39). In fact, some procedures required Plaintiff to be strapped to a hospital table. Tr. 2:212. Plaintiff also recalls three different endoscopic procedures under general anesthesia before the placement of stents. Id. at 213-14. Though Doctors Changela and Morganthal were ultimately able to stem the leak in November 2018 with clips (Doc. 58.30 at 30; Doc. 58.28 at 1), Plaintiff still experiences unresolved pain to this day. Id. at 224. Plaintiff testified that her good days saw pain levels around an eight out of ten that is aggravated by activity and interferes with her sleep. Id. at 225. Her pain makes her and those around her "miserable." Id. She takes somewhere around 120 tablets of Percocet or Vicodin a month. Id. at 226.

Plaintiff recounted one incident when a peripherally inserted central catheter ("PICC") line was used to deliver nutrients while she was covering from the leak. Id. at 233. She awoke to blood saturating her bed and covering her and her husband. Id. The PICC line disengaged during her sleep and created a scene Plaintiff described "the most terrify[ing] thing ever." Id. Plaintiff also continues to struggle with depression and anxiety. Id. at 235-36.

Dr. Peter Dorsher is a licensed physiatrist specializing in physical medicine rehabilitation. (Doc. 66 at 7; Tr. 6:7). He is not an expert in life care planning, gastroenterology, pain management, vocational rehabilitation, or psychiatry. Id. at 13 and 15. He reviewed Plaintiff's preoperative hospital records and reports regarding her functioning, including depression, id. at 20, and examined Plaintiff for about an hour, Tr. 2:230. After conducting an independent medical evaluation, Dr. Dorsher believed Plaintiff exhibited "non-organic or non-physiologic signs." Id.

Dr. Dorsher explained that Plaintiff's report of pain levels did not square with his observations of Plaintiff during his exam. For example, he described a pain level of 10 as burning alive or having an arm ripped off yet Plaintiff's presentation was inconsistent with that type of pain. Id. at 74. However, Dr. Dorsher was sure to clarify that he did not think Plaintiff was malingering, but rather her pain symptoms were magnified. Id. at 264.

Dr. Dorsher admitted Plaintiff's chromic pain is associated with her gastric sleeve surgery Tr. 6:149. He also conceded that Plaintiff's depression and difficulty adjusting to her new life is real, but blamed Plaintiff in part because she was allowing her pain to overwhelm her. Id. at 238-39.

Plaintiff's husband now cares for Plaintiff in a fulltime capacity, and the couple is no longer able to engage in many activities they once enjoyed, including sexual intercourse. Tr. 2:239-40. Mr. Reeley reported that he was involved with Plaintiff's care from the start of the surgery and is the one who drives her to receive ongoing treatment. Tr. 1:181. He reports that his time with Plaintiff playing games, attending sporting events, and traveling has been replaced with attending doctors' appointments. Id. at 182. He stated Plaintiff did not have limitations before her gastric sleeve surgery and now most activities are either limited or impossible. Id. at 185. Mr. Reeley testified Plaintiff cannot contribute to family chores like she once did. Id. at 187. He corroborates Plaintiff's testimony that she struggles to sleep and now battles mental illness. Id. at 192-93.

Mr. Reeley also detailed how Summer and Nolan Reeley struggle emotionally with Plaintiff's post-surgical state. Id. at 194-95. Both Nolan and Summer lived with Plaintiff at the time of her surgery and continue to live with Mr. Reeley and Plaintiff to help with Plaintiff's care. Id. at 202. Nolan was unable to complete his nursing program because he could not concentrate during class and felt obligated to care for his mother when he was home. Id. at 128-29. Nolan testified that Plaintiff is not the same

person, and the family misses family bowling nights and family trips. Id. at 134.

Summer Reeley described her mental health challenges, including several prior hospitalizations. Id. at 160. Summer depended on Plaintiff for care. Id. at 161. Plaintiff's injury devastated Summer and exacerbated her depression and anxiety. Id. at 164. Summer now is forced to do more household chores and no longer can enjoy things like getting her nails done with Plaintiff. Id. at 168-70.

Dr. Craig Lichtblau testified on Plaintiff's behalf as an expert in physical medicine and rehabilitation and brain injury. Tr. 3:9. Dr. Lichtblau evaluated Plaintiff's home, medical history, and performed a physical evaluation. Id. at 13. Dr. Lichtblau reported his agreement with Plaintiff's treating physicians, like Dr. Latif that Plaintiff would need pain management treatment for the rest of her life. Id. at 14. Dr. Lichtblau prepared a Comprehensive Rehabilitation Evaluation report (Doc. 58.38) that detailed the frequency and type of care Plaintiff needs.[2] Plaintiff's treating physicians agreed with Dr. Lichtblau's conclusions, except Dr.

---

[2] As indicated at trial, the Court considered only those portions of the Report about which Dr. Lichtblau testified.

Morganthal who could not say whether Plaintiff would need further surgical intervention. Id. at 14-15 and 42-43.

Dr. Lichtblau opined that Plaintiff's impairment rating was between 22 and 38 percent and had maximal improvement, i.e., palliative rather than restorative care now controlled. Id. at 60-61. Plaintiff experienced ten intraoperative, intraabdominal procedures and suffered from leaking hydrochloric acid rendering her permanently and totally disabled with chronic pain. Id. at 24-25. Plaintiff will need ongoing care from a primary care physician, general surgeon, gastroenterologist, anesthesiologist, and chronic pain management physician at an average of 3 visits per month combined. Id. at 43. Dr. Lichtblau also opined that Plaintiff would need around-the-clock care from a home health aide. Id. at 44. Dr. Lichtblau found that Plaintiff's complaints regarding pain were supported by her surgical history and in light of the damage to the organs in her abdominal cavity from the leak. Id. at 46-47.

Economist Bernard Pettingill holds two master's degrees, including one in medical economics and a PhD in medical economics. Tr. 3:128. Plaintiff offered Mr. Pettingill to quantify her economic damages. Id. at 131. He relied on Plaintiff's medical history and Dr. Lichtblau's Report. Id. He also testified that Plaintiff will live about 31.95 more years based on

the applicable life expectancy table. Id. at 132 and 140. Mr. Pettingill averaged the costs associated with Plaintiff's needed medical care, factored in inflation and then reduced the number to present value. Id. at 137. Ultimately, Mr. Pettingill arrived at $4,774,017.00 as the total past and future loss attributable to Plaintiff's injury. Id. at 138. On cross-examination, the Government forced Mr. Pettingill to concede that he overestimated the losses by $6128.00 because he double counted Plaintiff's pain medicine, leaving his estimated loss at $4,767,889.00.[3]

Because the operative facts occurred in Florida, the FTCA claims are predicated on Florida tort law. See Brownback v. King, 592 U.S. 209, 210 (2021) "To prevail in a medical malpractice case a plaintiff must establish the following: the standard of care owed by the defendant, the defendant's breach of the standard of care, and that said breach proximately caused the damages claimed." Gooding v. Univ. Hosp. Bldg., Inc., 445 So. 2d 1015, 1018 (Fla. 1984). The only issue for the Court to resolve now is the amount of damages.

---

[3] Plaintiff references a medical lien for $40,008.29. (Doc. 58.46), but the Court finds this amount is subsumed by Mr. Pettingill's opinion for the total amount necessary to compensate Plaintiff for her economic damages.

The first component of damages to be awarded is economic in nature, or those damages that will fairly and adequately compensate Plaintiff for past and future damages for the care and treatment of Plaintiff. Fla. Std. Jury Instr. 501.2. On this point, the Court finds Dr. Lichtblau and Mr. Pettingill's testimony persuasive. It is likely that Plaintiff needs $4,767,889.00 to compensate her for past and future medical expenses. Next the Court must determine the amount of damages to be awarded to Plaintiff for "any resulting pain and suffering, disability or physical impairment, disfigurement, mental anguish, inconvenience, or loss of capacity for the enjoyment of life experienced in the past or to be experienced in the future." Id. On this point and after evaluation of the entire record including the obviously devastating impact the negligently performed gastric sleeve surgery has had on Plaintiff, the Court finds $1,500,000.00 as the appropriate amount of damages for a total recovery for Mary Reeley of $6,267,889.00.[4]

---

[4] The Court is informed by other verdicts reached in cases involving the negligent performance of related surgeries. One such case is Mettias v. U.S., 1:12-cv-527 (D. Haw. 2015). In Mettias, the district court considered the life case plans, including inflation rates, discount rates, and present values in light of the testimony of economist. The court ultimately awarded $1,874,240 in compensatory medical damages and the statutory cap of $375,000.00 for actual pain and suffering and another $1,000,000.00 for past and future loss of enjoyment of life, mental anguish, emotional distress and loss of filial care and companionship. The court also award $100,000.00 for loss of parental care and companionship to her son.

Timothy Reeley is entitled to recover under a theory of loss of consortium as Plaintiff's spouse. See Trophia v. Camping World, Inc., 616 F. Supp. 3d 1305, 1309 (M.D. Fla. 2022). Damages must be awarded that compensate Timothy Reeley for the loss of Plaintiff's "services, comfort, society and attentions in the past and in the future caused by" the gastric sleeve surgery. Fla. Std. Jury Instr. 501.2. While the amount is hard to quantify, the duration of Timothy and Mary Reeley's marriage and the level of engagement the two enjoyed make apparent the catastrophic impact Plaintiff's injury has had on Mr. Reeley. On this point, the Court will award $250,000.00 to Mr. Reeley.

Florida also permits unmarried dependents to recover for the loss of parental consortium when a parent suffers a permanent total disability from a negligent act. Fla. Std. Jury Instr. 501.2(g). Compensation is due to cover lost services, comfort, companionship and society in the past and in

---

In Parker v. Allen Mikhail, M.D. et al., Case No. 1:11-cv-7676 (N.D. Ill. 2011), Plaintiffs (a mother and her minor child), sued for the alleged negligent performance of a gastric bypass surgery that resulted in a judgment for Plaintiffs totaling $9,400,000.00. The amount was detailed as follows:

> Reasonable expense of necessary medical expenses recovered = $400,000; Reasonable expense of necessary medical expenses to be received in the future = $5,500,000; Pain and suffering experienced = $500,000; Pain and suffering reasonably certain to be experienced in the future = $250,000; Loss of normal life experienced =$750,000; Loss of normal life reasonably certain to be experienced in the future =$2,000,000.

the future. Id. As to Nolan Reeley, he was able to obtain an Associate's degree and enter a nursing program. Tr 2:128. He also was able work full-time remotely following Plaintiff's surgery. Id. at 130. Given his age at the time of surgery and his current independence, the Court finds that Nolan was only briefly dependent on his parents following Plaintiff's surgery and the amount of money necessary to compensate him is $25,000.00. Summer Reeley, however, given her ongoing battle with mental illness, heightened dependance on Plaintiff, and age at the time of the incident has been and will likely be impacted to a greater extent than Nolan. Summer Reeley is due $50,000.00 for loss of parental consortium.

Accordingly, after due consideration, it is

**ORDERED:**

1. This Order is to be read in conjunction with the Court's Order regarding liability (Doc. 73). The Government is liable to Plaintiffs Mary Reeley, Timothy Reeley, Nolan Reeley, and Summer Reeley.

2. The Clerk of the Court shall enter judgment as follows:

    a. The Government shall pay Plaintiff Mary Reeley $6,267,889.00;

  b. The Government shall pay Plaintiff Timothy Reeley $250,000.00;

  c. The Government shall pay Nolan Reeley $25,000.00;

  d. The Government shall pay Summer Reeley $50,000.00.

2. The Clerk of the Court is directed to close this file and terminate any pending motions.

**DONE** and **ORDERED** in Jacksonville, Florida this __23rd__ day of August, 2024.

                _____
                 BRIAN J. DAVIS
                United States District Judge

2
Copies furnished to:

Counsel of Record